STELLA POLLACK et al., executors, &c., complainants,

*v.*

HAROLD H. BOWMAN et al., defendants.

[Decided February 20th, 1945.]

*Messrs. Stuhr & Vogt (Mr. Edward A. Markley and Mr. Raymond J. Lamb, of counsel), for the complainants.*

*Mr. William F. Hinchliffe (Mr. Edward A. Markley, Mr. Raymond J. Lamb and Mr. Hugh C. Spernow, of counsel), for the defendant Little Sisters of the Poor.*

64 

*Messrs. Pitney, Hardin & Ward (Mr. Mahlon Pitney,* of counsel), for the defendants Harold H. Bowman et al., trustees.

*Mr. Leo M. Rogers,* for the defendant estate of Isabell MacDonald.

FIELDER, V. C.

Andrew T. Fletcher died June 26th, 1930, leaving a will and codicil admitted to probate by the surrogate of Passaic County under which letters testamentary were granted July 9th, 1930, to the defendants Harold H. Bowman and The Paterson Savings Institution, the executors and trustees therein named (hereinafter called executors or trustees). By his will and codicil the testator gave all his property to said trustees to invest and keep invested and to pay the income therefrom to Joseph Hosek, Isabell MacDonald and other name individuals and he gave the principal of the trust, on the death of the last survivor of said beneficiaries, to the Little Sisters of the Poor (a charitable corporation).

Joseph Hosek died January 22d, 1939, leaving a will under which complainants Stella Pollack and William F. Hosek qualified as executors. Three years later (January 26th, 1942), Hosek's executors filed their bill in this cause and by it, and an amended bill, they charge the trustees with mismanagement of the Fletcher estate in certain specific respects, whereby loss resulted to that estate, to Joseph Hosek and other life beneficiaries and to Little Sisters of the Poor; they seek to compel the trustees to account for such loss. Isabell MacDonald was named as a defendant in the suit and a decree *pro confesso* had been entered against her. She died pending the suit and said decree was opened to permit her estate to enter an appearance.

At the outset it should be stated that I find no proof of fraud, lack of good faith, or self dealing on the part of the executors or trustees, or unlawful investments made by them. The question involved is whether they exercised reasonable diligence in the administration of the estate committed to their care.

The first charge made against the executors and trustees is with regard to the sale by them as executors of the entire issue of 500 shares of stock of Bakers and Consumers Compressed Yeast Co. (hereinafter called Yeast Co.).

Fletcher, for many years prior to and at his death, had been engaged in the business of a wholesaler of yeast. He had owned all the stock of the Yeast Co. and had transferred those shares, with other stocks and bonds, to Bee Financial Co., a holding corporation (hereinafter called Bee Co.) in which he owned the whole stock issue. Almost immediately after Fletcher's death the executors sought a purchaser for the Yeast Co. stock and in the meantime they continued the operation of the corporation. On or about May 4th, 1931, they sold to James J. Hastings, through the Bee Co., all the stock of Yeast Co. for the consideration of $350,000, of which $200,000 was to be paid in cash by Hastings and the balance of $150,000 was to be paid in successive annual installments of $25,000 each with interest, evidenced by Hastings' six promissory notes and they took as collateral for payment of the notes 250 shares of Yeast Co. stock and a policy of insurance on Hastings' life. Payment of each of Hastings' notes was expressly made conditional on the existence of the Yeast Co. on the date the respective notes became due. Shortly after the sale the Bee Co. was dissolved, the executors taking over the assets of that corporation, including Hastings' notes. When the sale was consummated the $200,000 Hastings was to pay the executors was paid by Hastings' check for $100,000 and the cancellation of a debt of $100,000 which Fletcher owed the Yeast Co. Much testimony was taken on the complainants' claim that Fletcher's indebtedness to the Yeast Co. was only $60,000 but I am satisfied, by analysis of that testimony, that his debt was actually $100,000 and that the executors were justified in accepting that amount as correct. When the first of Hastings' notes for $25,000 became due May 4th, 1932, he paid $5,000 on account and did not pay the balance in full until January, 1934. None of Hastings' other notes has been paid and Hastings abandoned the Yeast Co. some time in 1939.

The Yeast Co. had obtained its supply of raw yeast from

Fleischman Co. and Standard Brands and they were its sole source of supply at a price at which the Yeast Co. could operate at a profit and they could cut off the supply at any time. The executors feared to continue to operate the business themselves with the risk that the supply of raw yeast might be terminated suddenly and the Yeast Co. be put out of business. They were faced with the alternative of finding a purchaser for their stock or liquidating their corporation. There was no ready market for the stock and it had no certain marketability. They endeavored to sell to Standard Brands, or to some person connected with that corporation and they tried to find other purchasers, all without success. Hastings was a certified public accountant and for several years had been the accountant for Fletcher, Yeast Co. and Bee Co. and through that connection had acquired some knowledge of the yeast business. The executors knew him and they considered him to be an honorable man who would conduct the business capably, and when he approached them with an offer he was the only purchaser they had been able to find. He made several offers which the executors rejected and when his final offer was made, it was the best they had been able to get and the situation, as it appeared to the executors, was whether to accept it or liquidate their corporation. The testator's will authorized them to sell any of his estate on such terms as they might see fit.

The assets of the Yeast Co. consisted of real estate the fair market value of which at the time of the sale was about $40,000, and accounts receivable, machinery and fixtures having no greater book value than $60,000, all of which assets probably would not have realized a total of $100,000 on liquidation. But complainants insist that beside those assets the company had a good will of considerable value for which the executors should have received a consideration. The Yeast Co. had been a profitable business under Fletcher's management and had realized considerable profit down to his death but its good will depended on Fletcher's business ability and management and upon the personal relations he had established with Fleischman Co. and Standard Brands, the advantage of which relation they might terminate at any

time after his death. Moreover a general business depression existed in 1930 and Hastings was the sole available customer for the Yeast Co. stock; he declined to consider good will of any value, except as it might be represented in the $150,000 notes he offered as part of the purchase price and made payable only in case he could operate the company successfully. I think that when the executors received cash on the sale of the Yeast Co. stock, they received as much, if not more than they would have received if they had declined the offer submitted by the only purchaser in sight and had liquidated their corporation. Beside the cash received they had the expectation and possibility of realizing $150,000 on Hastings' notes and in fact they received $25,000 in payment of his first note and therefore they received a total of $125,000 and some interest in exchange for the fixed assets of their corporation, and Fletcher's liability of $100,000 to Yeast Co. was canceled.

I find that when the executors agreed to sell to Hastings they understood and believed from his statements to them that he intended to raise on his personal credit the $100,000 he was to pay them on account of the purchase price of the stock and I think such was Hastings' original intention but he failed to realize on it. Instead and pursuant to an arrangement he made shortly prior to the date for closing the sale, he borrowed $110,000 from a finance corporation and secured that loan by a mortgage on the Yeast Co. assets. It was from the proceeds of that loan he paid $100,000 to the executors so that no funds of his own were used for the purchase of Yeast Co. stock. Of course the terms on which the sale of the stock was consummated made it possible for Hastings to borrow on the corporation assets without the executors' knowledge or consent and he could have done that very thing at any time after he became owner of the 500 shares. Complainants contend that the executors, as part of the conditions of sale to Hastings, should have insisted on having representation on the board of directors of the Yeast Co. and thus maintain supervision over Hastings' operation of the company and that the executors also should have insisted on holding the whole 500 shares of Yeast Co. stock as collateral

for payment of Hastings' notes. The executors had endeavored to secure better terms from Hastings than those finally agreed on, including pledge of all stock and directorship representation, but Hastings refused to agree to such terms. The executors feared to continue to hold the Yeast Co. stock and to continue to operate the company and since Hastings was the only prospective purchaser and the executors were to receive all they believed the tangible assets of the corporation were worth, I think they were justified under the circumstances in agreeing to sell on the terms on which he was willing to become a purchaser.

The complainants further contend that the executors, before finally consummating the sale, were aware that Hastings was not intending to pay $100,000 from funds raised on his personal credit but had arranged to pledge the assets of the Yeast Co. to raise said sum and with that knowledge they should have refused to go through with the sale. It is my opinion that they had no such knowledge; if they had, I think they would have declined to transfer their stock. Executor Bowman and Paton (the latter an officer of the corporate trustee) had been directors of the Yeast Co. after Fletcher's death and had resigned in favor of Hastings' nominees prior to the meeting of the Yeast Co. directors at which the loan was approved and the mortgage authorized. On closing the sale Hastings produced his two checks of $100,000 each with which to pay the $200,000 called for by the agreement of sale on transfer to him of the shares of stock, both checks being drawn to the order of Bee Co. One of those checks went to the executors through Bee Co. and the other was endorsed by Bee Co. payable to Yeast Co. and represented payment of Fletcher's debt to Yeast Co. That check was delivered to Hastings for the Yeast Co. but he kept it and it was never cashed. Criticism is made that the executors should have seen to it that the proceeds of the latter check actually went into the treasury of the Yeast Co. Having delivered that check to Hastings, who was president of Yeast Co., I do not think it was the duty of the executors to see that he applied it properly. That check canceled Fletcher's debt to the Yeast Co. and his notes evidencing the debt, were surrendered to the executors.

The executors filed their first and final account August 5th, 1931, wherein they charged themselves with the amount of the inventory they had filed and, by way of schedules, detailed additions thereto and items for which they sought allowance. Those schedules were essential parts of the account and determination of the correctness of the account and of the balance with which the executors were chargeable, could not be made without reference to and examination of them. The first schedule of increase in *corpus* stated the dissolution of Bee Co. and the receipt by the executors of the assets of that corporation, including Hastings' notes for $150,000 therein stated to be part of the consideration for the purchase by him of the Yeast Co. stock. Then followed a statement of the sale of that stock to Hastings and an explanation in considerable detail of the terms of sale, all of which I consider was amply sufficient to put all parties in interest on notice of the fact and terms of that sale and on inquiry concerning it, and to require them to present to the Orphans Court by way of exceptions, any objections they might have had thereto, but no exceptions were filed and on September 17th, 1931, the Orphans Court entered its decree approving the account. That decree entered on due notice to all beneficiaries under Fletcher's will estops them from now making any objection to the sale or to the terms and conditions on which it was made. *Shearman* v. *Cameron*, 78 *N. J. Eq.* 532; *Beam* v. *Paterson, &c., Co.*, 96 *N. J. Eq.* 141; *affirmed*, 99 *N. J. Eq.* 427; *In re Leupp*, 108 *N. J. Eq.* 49; *Rothenberg* v. *Franklin Washington Trust Co.*, 127 *N. J. Eq.* 406; *affirmed*, 129 *N. J. Eq.* 361; *In re Schlemm*, 130 *N. J. Eq.* 295; *Brown* v. *Fidelity Union Trust Co.*, 135 *N. J. Eq.* 404.

The executors turned over to themselves as trustees the stocks, bonds and other securities (including Hastings' notes) representing the balance decreed to be in their hands and in the seven accounts thereafter filed by trustees, each allowed by Orphans Court decree (the last on October 20th, 1938), appear items which would call attention of the beneficiaries to the fact that only the first of Hastings' six notes had been collected, but the beneficiaries failed to except to any of those accounts or to make objection in any way to the trustees' failure to collect the balance of Hastings' notes.

Having received the Hastings' notes, the question is whether the trustees were guilty of negligence in failing to collect them. Complainants contend that the trustees certainly learned as early as March, 1932, of the mortgage Hastings had placed on the Yeast Co. assets and that they should have proceeded against Hastings when he defaulted on his first note which fell due in May, 1932. I think it was too late to attempt to disavow the sale they had made as executors since it appears that Hastings acted within his legal rights in effecting the loan to the Yeast Co. and the mortgagee of the Yeast Co. assets had a paramount lien thereon. The trustees then could only expect that Hastings would be able to discharge his first and subsequent note obligations if he were left to maintain the corporation as a going concern, because those notes were not the ordinary form of promissory note; they were not to become due and payable unless on the due date Hastings remained in the yeast business.

The first note fell due May 4th, 1932, and being unpaid, suit might have been brought thereon at once for the balance due after Hastings had paid $5,000 on account. Likewise suit might have been brought on the other notes as they fell due up to May, 1937, for Hastings remained in the yeast business up to 1939, but suit on the first note probably would have forced Hastings out of business and thus he would have been relieved from liability on his other notes and as a matter of fact the first note was paid in full. When the second note fell due in May, 1933, conditions in the yeast business were bad and so continued as the remaining notes matured. The question facing the trustees in 1933 was whether to sue Hastings on the note which became due that year. They learned that he was financially irresponsible and they decided that their only hope of collecting on his notes was through permitting him to continue in business and they felt that if they pressed him they would force him out of business and into bankruptcy. Standard Brands was the Yeast Co.'s large creditor and that company made concessions to Hastings on the price of raw yeast and not only refrained from attempting to collect its debt but canceled a portion thereof and helped him rebuild his plant and install new equipment. Thus the

trustees had reason to hope that the yeast business would show better results and their judgment was that it was wiser to permit Hastings to continue in business rather than take steps which might result in forcing him out.

When Hastings' business situation failed to improve, negotiations for settlement through the trustees' attorneys resulted in an offer by Hastings to settle for $2,500. Late in 1939 or early in 1940 Little Sisters of the Poor and all life beneficiaries under Fletcher's will (except Hosek who had died) gave written authority to the trustees to accept such settlement and agreed to release the trustees from all claims by reason of so doing. Hosek's death terminated his interest in the estate but because his executors objected to the settlement, the trustees submitted it to the Passaic Orphans Court for instructions but before that court had acted thereon this suit was instituted. By counter-claim filed by the trustees that offer of settlement is now before this court for determination.

I am of the opinion that the trustees should be authorized to accept $2,500 in settlement of Hastings' indebtedness to them, which indebtedness has been kept alive by a token payment thereon to toll the statute of limitation. Hastings, as I have said, is a public accountant and so far as any of the parties in interest have been able to show, he has no assets in his own name other than the 500 shares of worthless Yeast Co. stock. His only income is from his profession and that net income for 1939 was $341.88 but it had increased to about $8,000 net for 1943. Some proportion of his income might be collected in monthly installments under execution on a judgment recovered against him but even so it would take several years to collect as much as $2,500. He had failed to pay premiums on his life insurance policy held by the trustees as collateral for his notes and for a time the trustees paid the premiums, but finally surrendered the policy for its cash value. He had purchased a home in 1929 for $17,500, title to which he transferred to his wife in 1936. What the present value of that property is and what encumbrances there may be against it do not appear. That transfer might be set aside as in fraud of creditors but it is possible that his wife might have a valid defense to a suit for that

purpose. The Yeast Co. stock is worthless. That corporation went out of business in 1939 and since then it has been a defunct corporation. It was then indebted to Standard Brands to the extent of $240,000 and Standard Brands advanced money to pay its other creditors and thereupon asserted a claim to a first lien on all Yeast Co. assets, including its real estate which is in a dilapidated condition and against which there are arrearages of taxes. Considering the expense which would be involved in litigation to recover anything on account of the trustees' claim, the uncertainty of the net amount of recovery and the ever present possibility of bankruptcy, the trustees will be authorized to accept Hastings' offer of settlement.

The complainants seek to charge the trustees with losses sustained through their failure to dispose of the common stocks owned by the testator which they received as executors and transferred to themselves as trustees.

The inventory of the testator's personal estate shows a list of securities appraised at $827,863.62 made up in part of 23,750 shares of Standard Brands common appraised at $436,406.25 and other common stocks appraised at $57,526.09. The executors' account shows that through dissolution of Bee Co. they received 2,300 additional shares of Standard Brands common valued at $42,262.50 and other common stocks valued at $92,504.13. Pursuant to the decree entered September 17th, 1931, on the executors' account, the executors turned over to themselves as trustees 26,050 shares of Standard Brands at $18-3/8 per share for a total of $478,668.75 and other common stocks valued at a total of $150,030.22. Thus about 75% of the estate was represented by common stocks practically all of which (except for the sale of some Standard Brands) are still held by the trustees with the result that as between inventory or book value and market value as of the last date of hearing of this cause (October 24th, 1944) a loss of nearly $150,000 is shown. Those stocks now represent investments in about thirty different corporations.

A difficult situation with regard to administration of the estate faced the executors and trustees at and after the testa-

tor's death. It is easy to say now, with our present knowledge of what happened, that the trustees should have disposed of all common stock and taken such loss as against book or inventory values as might have resulted, instead of retaining their holdings on a falling market in the mistaken belief that better prices would return.

There was a general decline in market prices of all stocks in and after 1930 and the trustees show that in determining whether or not to dispose of their stock holdings, they relied on reports of financial and investment publications and the advisory opinions therein contained, as well as on advice frequently sought and obtained from bankers, brokers and other financial sources. They point to the collapse of many banks and to the bank holiday declared in March, 1933, also to the fact that the United States Government had gone off the gold standard at or about that time and to the general prediction in investment and banking circles of coming money inflation which would have a depressing effect on the value of bonds and dollars, and it was their judgment in 1931 and 1932 that retention of common stocks of corporations whose business it was to produce goods and services was proper and desirable as providing adequate security for the beneficiaries of their trust. Sharp differences of opinion arose in 1933 between trustee Bowman and the vice-president of the corporate trustee who had charge of the estate, as to whether the trustees should not dispose of all their Standard Brands stock. Their differences were based on careful studies each had given to that stock and they reached different conclusions. Bowman favored such sale and his co-trustee did not but they finally agreed on sale of 11,000 shares as hereinafter stated, and although Bowman continued to urge further sales of that stock throughout 1934 he finally deferred to the opinion of the banker who was supposed to have better judgment in financial matters than Bowman, a lawyer, and no more stock was sold until August, 1939. I consider the fact that the trustees argued as between themselves as evidence that each was giving careful thought and due consideration to the proper performance of his duties. As to other common stocks, the market fell so rapidly that it was the trustees'

belief they should not sell at sacrifice prices but should wait for a reaction. There is no proof that the trustees did not at all times give diligent and honest consideration to their duties or that the retention of the common stocks was not the result of their disinterested conviction that they were pursuing the wisest course. The trustees were not bound to act correctly and at their peril if they made a mistake in honest judgment in retaining the investments which came to their hands as part of their testator's estate; they were only bound to act in good faith with reasonable discretion. *In re Megargee,* 117 *N. J. Eq.* 347; *In re Cross,* 117 *N. J. Eq.* 429.

That their judgment was good in deciding not to sell Standard Brands at the declining prices of 1931 and 1932 is shown by the fact that in a market rebound of that stock in June and July, 1933, they sold 11,000 shares at an average price of about $33 per share, thus realizing a profit of approximately $150,000 over book value. Thereafter the stock showed a steady decline; it reached a low of $2-7/8 per share in 1942 but the trustees made no further sale of that stock until August, 1939. Beside the investigations and inquiries I have mentioned made by the trustees concerning all the common stocks they held, they made special investigation concerning Standard Brands, as to its assets and earnings and the corporation's book value of the shares and they were impressed by the fact that Standard Brands never failed to pay dividends, although at decreasing rates, which dividends based on market prices for the stock produced a favorable income yield for their trust. The testimony shows at great length the frequent and careful inquiries made independently by both trustees into the condition of Standard Brands, their conferences with men whose business it was to deal in securities and their study of information and advice given by those men and by investment publications all of which led them to believe in retention of that stock. It is easy to say now that the trustees should have disposed of all Standard Brands stock in 1933 when they sold 11,000 shares, or in 1934 or 1936 when they could have sold the balance of their holdings

at some profit above book value, but whether they acted with reasonable care, prudence and discretion must be determined on the basis of the situation as it then appeared to the trustees. I believe that in good faith they acted on what they considered good judgment and reasonable discretion in continuing to hold their common stocks, at least until 1938 and at no time did any of the beneficiaries make objection to the trustees.

Beside the executors' account filed and allowed in 1931, the trustees filed seven annual accounts, the first one August 17th, 1932, and the last September 17th, 1938, each of which after due notice to all beneficiaries according to statute, was approved and allowed by Orphans Court decrees. Pursuant to an Orphans Court rule then in effect, each account had annexed thereto a schedule or list of securities in which the estate was invested, the list showing trustees' book value of each security and such list in every account showed that the trustees still held the common stocks which had come to their hands as investments made by their testator. The rule of court referred to was promulgated by the Ordinary under the authority of *R. S.* 2 :30–1 and it has been held that Orphans Court rules are as binding as the statutes (*In re Sinovcic,* 80 *N. J. Eq.* 260). It is said in reported and unreported cases in this state that notwithstanding the rule, such a statement is not a part of the account and that an Orphans Court decree approving an account does not carry with it approval of any investment shown in such statement, in the absence of any issue raised before the court with respect to investments. It will be found that the investments involved in those cases were such as were challenged as having been made contrary to the direction of a testator's will, or as unlawful investments, or as non-legals. In the instant case all common stocks were the testator's investments and came to the hands of the trustees as such. It was lawful for the trustees to continue such investments in the exercise of good faith and reasonable discretion. *Comp. Stat., p.* 2271, § 34; *R. S.* 3 :16–12.

The list of securities annexed to the executors' and trustees'

several accounts and the items in each account which show receipt of dividends from stocks, gave notice that the trustees continued to hold the common stocks and imposed on all parties in interest a duty to file exceptions to the accounts if they were not satisfied and content that the trustees were acting in good faith and with reasonable discretion, in continuing to hold the same. If they chose to ignore those accounts and neglected to examine them, they should not be permitted to urge that they were not bound to know the situation thereby disclosed with respect to the common stocks. Failing to object, I think the decrees of the Orphans Court bar them from now asserting that the trustees failed to act in good faith or with reasonable discretion in continuing to retain such investments, at least down to the date of allowance of the trustees' last account. *Beam* v. *Paterson, &c., Co., supra; In re Cooke,* 96 *N. J. Eq.* 589; *affirmed,* 99 *N. J. Eq.* 423; *City Bank, &c., Co.* v. *McCarter,* 111 *N. J. Eq.* 315; *Rothenberg* v. *Franklin Washington Trust Co., supra; In re Schlemm, supra; In re Ward,* 121 *N. J. Eq.* 555; *affirmed,* 121 *N. J. Eq.* 606; *In re Rothenberg,* 129 *N. J. Eq.* 377; *Van Buren* v. *Plainfield Trust Co.,* 130 *N. J. Eq.* 244.

Hosek, whose representatives filed the bill in this cause three years after his death January 22d, 1939, was interested solely in receiving a portion of the net income of the estate during his life, and so was Isabell MacDonald. They were under a duty to object to the accounts if it appeared to them that the estate was not invested safely so as to produce the maximum amount of income for their respective lives. As to them there can be no adjustment of income because, there being no fraud or mistake with respect to the trustees' accounts, the decrees entered thereon were certainly binding on them as to the correctness and finality of the income charge and discharge portions of each account down to and including the last account filed a few months prior to Hosek's death. Some time toward the end of 1931 in a discussion of the accounts of the estate with one of the executors, Hosek had approved the various common stocks afterward taken over by the trustees and had stated his wish that the trustees would

not sell any Standard Brands but would continue to hold that stock. In February, 1932, he had his attorney inspect the inheritance tax proceedings of the estate (which proceedings showed the estate securities) and subsequently his attorney received copies of the trustees' first four accounts. The Little Sisters of the Poor discussed the estate frequently with the president (now dead) of the corporate trustee and it does not appear that it ever made objection to any of the trustees' accounts. As a defendant named in the bill of complaint, the Little Sisters of the Poor merely filed a formal answer to the bill and never sought affirmative relief as against the trustees until this cause came on for final hearing.

After 1933 the common stocks held by the trustees continued to drop in market value. The judgment of the trustees that they should hold those stocks, first exercised at the time of testator's death and thereafter continued, proved to be erroneous although reached in good faith. The hope or expectation in which they indulged that there would be an upturn of the market and that the market value of those stocks would increase in time to approximately inventory value, had not been realized when they filed their 1938 account and it was about that time that earnings of Standard Brands fell off and its dividends were reduced. Published investment advice was unfavorable as to continued holding of that stock and Bowman was again urging its sale. I think that in the exercise of reasonable discretion the trustees should have known in 1938 that they held an undue number of shares of common stocks of uncertain value and that it was their duty to have sought allowance in their 1938 account for depreciation in the book value of their assets (as they did in the account they filed with this court in 1942), or to have petitioned the Orphans Court for instructions as to whether or not to continue those investments, but they did neither and except for sale of some shares of Standard Brands they continued to hope on a falling market and now fourteen years after testator's death they still hold those stocks, on at least some of which loss has been suffered even on the basis of market value those stocks had in 1938. I think the time has

come when the trustees should be directed to dispose of all common stocks, except of course those which had become worthless prior to 1938 and have had no value since that time, and that they should be charged with any loss sustained since 1938 to be determined on the basis of the market value of their stocks as of the date of the decree allowing their last account, which decree in effect fixed their accountability for whatever value those stocks had at that time (*Brown* v. *Fidelity Union Trust Co., supra*) and which date was the last time the beneficiaries may be said to have assented to the retention of those stocks.

As to Standard Brands, the trustees held 15,050 shares of that stock at the time of their 1938 accounting. They sold none of those shares until August, 1939, and between that date and February, 1940, they sold 5,050 shares at an average price of $6-½ a share, thus suffering a loss of approximately $60,000 on the basis of book value. It should be stated that in 1943 Standard Brands reduced its shares of common stock in the proportion of one new share for each four shares, which does not affect the nature or amount of the trustees' holdings for the purposes of this case. To avoid confusion I speak of the stock as though the trustees still hold 10,000 shares. The net result of all sales of Standard Brands shows a profit to the estate of about $90,000 over book value but the trustees still hold 10,000 shares the market price of which on the last day of the hearing of this cause was $7-¼ per share, or a then depreciation on those remaining shares of about $110,000 as against trustees' book value. Believing that the beneficiaries are estopped from complaining of the failure of the trustees to dispose of the 15,050 shares they held up to the time of allowance of their seventh account, I think the trustees should be charged with the market value of those shares as of the date of allowance of that accounting, which the testimony shows was $8-¼ per share. After making sale the trustees will be surcharged with whatever loss they will be found to have sustained on 15,050 shares, such loss to be the difference between the sale price and $8-¼ per share.

As to the balance of the common stocks held by the trus-

tees which they will be directed to dispose of, some testimony was taken to show the fluctuating prices on several of those stocks but the testimony does not show what the market price was on any of them as of the date of the allowance of the trustees' seventh account. Reference to a master will be necessary to ascertain the fact and the trustees will be charged with the net difference between the prices at which they disposed of those stocks and the market prices so ascertained.

It follows that the trustees' report and account made part of their counter-claim filed in this cause, wherein they pray allowance (among other things) for depreciation in value of some common stocks based on the difference between book and market value and wherein, in their statement of assets on hand as of January 15th, 1942, they show a difference by way of depreciation between book and market value of other common stocks, cannot be allowed. They will be directed to file a supplemental account after they have disposed of all common stocks, to show the result of such disposal and to bring their account down to date.

Complainants seek a decree that the trustees forfeit all commissions and be removed as trustees. That decree will not be granted. The proofs show honest mistake in judgment on the part of the trustees but no bad faith. *Babbitt* v. *Fidelity Trust Co.*, 72 *N. J. Eq.* 745; *McAllister* v. *McAllister*, 120 *N. J. Eq.* 407; *affirmed*, 121 *N. J. Eq.* 264; *In re Johnston*, 127 *N. J. Eq.* 576; *affirmed*, 129 *N. J. Eq.* 104; *Rothenberg* v. *Franklin Washington Trust Co.*, 131 *N. J. Eq.* 463.